518 F.Supp. 170 (1981)
Louise DILLON, Plaintiff,
v.
CHRYSLER CORPORATION, Defendant.
No. 79-128 C(1).
United States District Court, E. D. Missouri, E. D.
June 25, 1981.
As Amended August 20, 1981.
*171 Doris Gregory Black, St. Louis, Mo., for plaintiff.
Charles E. Newman, Carol E. Jackson, St. Louis, Mo., for defendant.
WANGELIN, Chief Judge.

MEMORANDUM
This matter is before the Court for a decision upon the merits following a two day bench trial held on May 19 and 20, 1980. Plaintiff, a black female, seeks recovery of backpay, reinstatement, actual and punitive damages, and reasonable attorney's fees and costs expended herein pursuant to Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000e, et seq. and 42 U.S.C. § 1981. Plaintiff brings this suit alleging that defendant racially and sexually discriminated against her in her suspension and eventual discharge.
After consideration of the testimony adduced at trial, the exhibits introduced into evidence, the briefs of the parties, and the applicable law, the Court hereby makes and enters the following findings of fact and conclusions of law. Any finding of fact equally applicable as a conclusion of law is hereby adopted as such, and, conversely, any conclusion of law applicable as a finding of fact is hereby adopted as such.

Findings of Fact
1. Plaintiff, Louise Dillon, is a black female citizen of the United States and a resident of the City of St. Louis, Missouri. Defendant, Chrysler Corporation, is an employer within the meaning of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(b).
2. Plaintiff was hired by defendant Chrysler Corporation's Missouri truck assembly plant in Fenton, Missouri on July 29, 1976, where she was initially employed as an assembler and assigned to work in Department 9150. On October 5, 1976, plaintiff was assigned to the Body-In-White Department, Department 9110, where she was classified as a welder (gun portable) and with the exception of a brief assignment in Department 9130 (the paint department), plaintiff remained in Department 9110 until April 28, 1978, the date of her suspension and retroactive discharge.
3. On April 28, 1978, plaintiff was assigned to work in the major buck area of Department No. 9110 under the supervision of foreman Gary Grob. Her job duties, which she had been assigned to and performed for a year prior to her discharge, consisted of welding the toe boards, front headers and rear headers of the vans positioned on the assembly line. This spot welding was performed with the use of a counter-balanced welding gun which was suspended on cables attached to an overhead track.
4. Plaintiff Dillon reported to work on the second shift on April 28, 1978 at approximately 5:00 p. m. At the beginning of the shift, plaintiff told Grob that her back was bothering her and requested a medical pass. Grob responded that he would prepare a medical pass as soon as possible and in the meantime he located another employee to assist plaintiff until she could be allowed to leave her work station. Approximately fifteen minutes after plaintiff complained to Grob, the medical pass was forthcoming and plaintiff Dillon proceeded to the plant's medical department. Although plaintiff had apparently taken medication for a variety of injuries to her back and left leg, she never related this fact to her supervisor, and as a result Grob was unaware that the plaintiff was taking such medication.
*172 5. When plaintiff returned from the medical department she gave Grob a slip indicating that she should be assigned to "light duty" (a PQX-C classification). The plant medical department classified plaintiff as PQX-C based upon her complaints of her medical disabilities and upon the statement plaintiff presented from her own physician, Dr. Leslie Bond, that she was physically able to perform light duty.
6. Before plaintiff was sent back to work, foreman Grob asked Joseph Shouley, the safety administrator on duty during the second shift, to examine plaintiff's spot welding job to determine whether it was within the PQX-C (light duty) classification. Shouley examined the work duties to be required of plaintiff, and determined that it could be performed by someone with a PQX-C classification. Thereupon, plaintiff was instructed to return to work on the spot welding line.
7. As the work shift progressed, foreman Grob observed that plaintiff was working very slowly and was missing numerous welds on every van. Each unit required twenty-three spot welds, and in some instances Grob observed that plaintiff Dillon missed anywhere from ten to fifteen welds. After noting the shoddy workmanship, Grob discussed the seriousness of the problems and the effect it was having upon the production line with plaintiff. She was offered instructions but her performance continued to suffer, in fact, worsened. Again noting that after instructing plaintiff as to the correct method of placing the welds, Grob called his general foreman who told him to get in touch with the department superintendent, Ivan Coleman, and relate to him the difficulties plaintiff was having and the effect it was having upon production. Coleman requested that Grob send plaintiff Dillon to the department office, a request with which he complied. In the department office Coleman asked plaintiff why she was not performing her job and inquired of her whether there was another job in the department which she might be better able to handle. Plaintiff indicated that she was having a problem with her back but failed to make Coleman aware of her use of medication. In addition, plaintiff insisted that she was doing her job the best she could. Coleman decided to assign plaintiff to the rear sill welding job on the B-3 line in Department 9110, for the reason that he believed plaintiff Dillon would be able to perform this job while standing erect and therefore not subject herself to any back strain. The rear sill operation requires the use of a welding gun which is lighter and smaller but is otherwise substantially similar to the counter-balanced gun used on the major buck operation. Safety Administrator Shouley also inspected this rear sill operation and found it to be within plaintiff's PQX-C light duty classification.
8. Because the rear sill operation was new to plaintiff, another employee was assigned to work with her and show her how to perform the job. Immediately prior to the relief break at 2:30 a. m. Coleman received a call from Donald Koser, the general foreman of the B-3 line, reporting that plaintiff had damaged several vans on the line. After the end of the break (2:45 a. m.) Coleman went to the B-3 area to observe plaintiff, who had now been working on the rear sill welding job for approximately three hours. Coleman observed plaintiff's work for twenty five minutes during which time he saw her damage a van by allowing the counter-balanced gun to swing into the side of the vehicle. Coleman then proceeded to instruct foreman Jim Webb to show plaintiff how to push the transformer away so that the gun would not swing into the van. Coleman observed Webb demonstrate this procedure to plaintiff; however, plaintiff again failed to move the transformer away and a second van was damaged. After observing plaintiff damage a second van immediately after being instructed in the procedure of moving the transformer so as to prevent its striking the unit, Coleman decided that plaintiff should be disciplined for failing to follow instructions and for damaging company property.
9. Foreman Webb escorted plaintiff to the department office where they were met by Shouley, Koser and the chief union steward, *173 R. Enloe. Webb told the plaintiff that she was being suspended for a violation of shop rules 6, 8 and 9, whereupon plaintiff replied in a loud voice that his accusations were "all a damn lie".[1] Present in the department office, although not a participant in the suspension conference, was general foreman Larry Eager. Hearing the discussion which took place involving Webb and plaintiff Dillon, Eager looked up at Dillon whereupon she asked Eager "What the fuck are you looking at?" Eager, apparently sensing the rhetorical nature of the question, made no response. Plaintiff then immediately left the department office to retrieve her identification badge, turned to Eager and said "It's about time for your ass to die."
Although plaintiff testified that she had been subjected to harassment by white employees, when both incidents were reported to her foreman Gary Grob he counseled the white employees to refrain from such conduct. Apparently plaintiff and a variety of employees who worked with her in major buck area had difficulty in cooperating, and in an effort to insure that plaintiff and those employees working with her functioned together as a team, Grob would frequently reassign employees in other work stations to the area plaintiff was working.
10. On May 2, 1978, plaintiff's suspension was changed to a discharge and made retroactive to April 28, 1978 based upon her violation of numerous shop rules, specifically numbers 6, 8, 9, 13 and 14. (See footnote 1.) Her suspension on April 28, 1978 had been based upon a violation of shop rules numbers 6, 8 and 9, and her discharge was based upon violation of those three rules and in addition her unruly conduct and abusive, obscene, threatening language directed toward general foreman Eager (Rules 13 and 14).
11. In response to her suspension and eventual discharge, plaintiff proceeded to take a variety of steps to rectify what she felt was her racial and sexual discriminatory based suspension discharge.
12. United Auto Workers Local 110 submitted a grievance on plaintiff's behalf on May 2, 1978 in which an allegation was lodged that plaintiff was improperly assigned to a job which was not within her physical capacity. This grievance was eventually withdrawn by the union without prejudice.
13. On May 3, 1978, United Auto Workers Local 110 filed another second grievance contending that plaintiff's discharge was unjust. This unjust discharge grievance eventually blossomed into an arbitration hearing with plaintiff being represented by Daniel Bayer, Chief Steward of Local 110. The arbitrator, James D. Eckhoff, received evidence from both parties and concluded that plaintiff had violated the shop rules on which her discharge was based. Eckhoff also found that plaintiff had failed to prove that she was physically unable to perform her job.
14. On May 22, 1978, plaintiff filed a charge of racial and sexual discrimination with the Equal Employment Opportunity Commission (hereinafter E.E.O.C.). On November 7, 1978 the E.E.O.C. issued a determination and notice of right to sue and had concluded that there was no reasonable cause to believe that the allegations made in plaintiff's charge were true.
15. No evidence was offered by plaintiff Dillon that she was treated differently than male employees with respect to either job assignments or disciplinary action.
16. In contradistinction, defendant Chrysler presented evidence, by Thomas Kallaos, Chrysler's Equal Employment Opportunity *174 Administrator, that four white male employees were suspended and discharged for the same or similar reasons cited in the suspension and discharge of plaintiff Dillon. These employment records introduced by defendant Chrysler demonstrated that behavior similar to that of plaintiff Dillon had in the past resulted in suspension and discharge for violation of shop rules.

Conclusions of Law
This Court has jurisdiction over the parties herein and has subject matter jurisdiction pursuant to 28 U.S.C. § 1343 and 42 U.S.C. § 2000e-5(f)(3).
McDonnell Douglas Corporation v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) sets forth the basic allocation of hearings, and the order, presentation and proof in a Title VII discriminatory treatment case. In order to establish a prima facie case of discrimination, plaintiff must prove by a preponderance of the evidence: (1) that she is a member of a protected class; (2) that she was discharged; and (3) that she was discharged under circumstances which give rise to an inference of unlawful discrimination. In this instance, plaintiff is a member of two protected classes  being a black and being a woman  and she was suspended and eventually discharged. However, she has failed to show by a preponderance of the evidence that she was suspended and eventually discharged either because of unlawful racial or sexual discrimination. With respect to the argument that plaintiff was discriminated because of her sex, the evidence shows that there was frequent friction between plaintiff and fellow workers at her job assignment location. In one instance, plaintiff testified that she was called a "bitch". The testimony indicated that her foreman, Gary Grob, when notified of such friction between plaintiff and fellow workers took several steps to minimize the conflict. To this end, Grob would rotate employees amongst plaintiff's work area and when made aware of any specific incidences of alleged harassment by plaintiff, admonished the employees involved to cease. The evidence indicates that defendant Chrysler did not encourage or condone such conduct by plaintiff's co-workers. In addition, plaintiff has failed to fulfill the requirement of showing by a preponderance of evidence that such derogatory comments were so excessive and opprobrious as to constitute unlawful employment practice. Rogers v. E.E.O.C., 454 F.2d 234, 238 (5th Cir. 1971). And, evidence was introduced that four white male employees were also discharged for conduct similar to that of the plaintiffs. Clearly, the "Guide to Good Conduct" was applied evenhandedly to male and female, white and black alike. In the absence of proof, rising to a preponderance of evidence, that defendant or defendant's employees were guilty of sexual or racial discrimination, the plaintiff has failed to make a prima facie showing of discrimination and the inquiry may terminate, with a verdict in defendant's favor.
However, even if plaintiff had succeeded in proving a prima facie case thereby shifting to the defendant the burden of articulating some legitimate, non-discriminatory reason for the employees' treatment, (discharge) defendant Chrysler still prevails in the instant case. Assuming, arguendo, that plaintiff Dillon had shown a prima facie case, then defendant merely bears the burden of producing evidence that legitimate, non-discriminatory reasons existed for the challenged employment action (suspension and discharge), and does not bear the burden of persuading the Court that it was actually motivated by the reasons. Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).
The facts adduced by testimony in this case present overwhelming evidence of plaintiff's violation of Chrysler's shop rules. The evidence shows that plaintiff failed to follow the instructions of a supervisor who instructed her in the utilization of a light welding gun, that she repeatedly damaged vans by allowing the gun to swing into the side and thereby dent the unit, that repeated instruction by foreman Webb under *175 the supervision of department superintendent Coleman continually resulted in plaintiff's deliberate or at least negligent destruction of the van units, and that she engaged in threatening and abusive language directed to company personnel in the department office, specifically, to general foreman Eager.
In summary, plaintiff has failed to show that the reasons articulated by defendant for the suspension and eventual discharge were pretextual and thus plaintiff has not carried her burden of persuasion of showing the critical elements of discriminatory motive. See Texas Dept. of Community Affairs, supra, and Teamsters v. United States, 431 U.S. 324, 335 n.15, 97 S.Ct. 1843, 1854 n.15, 52 L.Ed.2d 396 (1977).
Accordingly, judgment will be entered for defendant.
NOTES
[1] Chrysler Corporation maintains established shop rules. Infractions of Chrysler's "Guide to Good Conduct" may be the basis for disciplining employees. Examples of misconduct which may warrant discipline include: "(6) Failure or refusal to follow the instructions of supervision. (8) Production of excessive scrap or inferior work. (9) Negligent or deliberate damage or destruction of property owned or held by the corporation or any employees, and for such abuse or misuse or unauthorized use of any such property. (13) Threatening, intimidating, coercing or using abusive language to others. (14) Fighting, "horseplay" or other disorderly, disruptive or unruly conduct."